2004 OK CR 36

**Brian Darrell DAVIS, Appellant**

v.

**STATE of Oklahoma, Appellee.**

No. D–2003–256.

Court of Criminal Appeals of Oklahoma.

Dec. 14, 2004.

L. Wayne Woodyard, John Dalton, Oklahoma Indigent Defense System, Capital Trial Division, Sapulpa, OK, attorneys for appellant at trial and appeal.

Mark L. Gibson, District Attorney, Brian Surber, Assistant District Attorney, Newkirk, OK, attorneys for the state at trial.

W.A. Drew Edmondson, Attorney General of Oklahoma, Robert Whittaker, Assistant Attorneys General, Oklahoma City, OK, Mark L. Gibson, District Attorney, Newkirk, OK, attorneys for appellee on appeal.

## *OPINION*

STRUBHAR, Judge.

¶ 1 Brian Darrell Davis, Appellant, was tried by jury in the District Court of Kay County, Case No. CF–2001–733, where he was convicted of one count of First Degree Malice Murder and one count of First Degree Rape, After Former Conviction of Two Felonies. The jury set punishment at death for the murder after finding the murder was especially heinous, atrocious or cruel[1] and

1. 21 O.S.2001, § 701.12(4).

2. Davis' Petition in Error was filed in this Court on March 26, 2003. Appellant's brief was filed March 5, 2004, and the State's brief was filed

one hundred (100) years imprisonment for the rape. The Honorable Leslie D. Page, who presided at trial, sentenced Davis accordingly. From this Judgment and Sentence, he appeals.[2]

## FACTS

¶ 2 In the early morning hours of November 4, 2001, Davis returned home after socializing with some friends at a local club, only to find his girlfriend, Stacey Sanford, and their three-year-old daughter missing. He telephoned Josephine "Jody" Sanford, Stacey's mother, to ask if she had seen or knew of their whereabouts. Jody told Davis that she did not know where they were. Ten to fifteen minutes later, Davis again telephoned Jody and asked her to go and find them. When Jody could not locate her daughter and granddaughter, she went to Stacey's and Davis's apartment.

¶ 3 Davis made several conflicting statements about the events that followed once Jody arrived, including a different version during his trial testimony. However, with the exception of his first statement where he claimed to have no memory of what had happened, Davis admitted in his other statements that he fatally stabbed Jody. Jody's body was discovered shortly after 9:00 a.m. when her daughter Stacey returned home. Stacey immediately called 911 and local police arrived to investigate.

¶ 4 Meanwhile, Davis had been involved in a single-car accident while driving Jody's van near the Salt Fork River Bridge. Davis was seriously injured after he was ejected from the van through the front windshield. Davis was transported to a local hospital for treatment. Because there was an odor of alcohol about him, Davis was placed under arrest and his blood alcohol level was tested and registered .09%. Later on, Davis was transported to a Witchita hospital for further care.

¶ 5 Detective Donald Bohon interviewed Davis around 5:49 p.m. that afternoon. In his first statement, Davis was able to recount his activities at the club the night before, but

July 9, 2004. The case was submitted to the Court on July 15, 2004. Oral argument was held October 26, 2004.

could not remember who drove him home. He recalled that Stacey and his daughter were not at home when he arrived and he remembered telephoning Jody. He could remember Jody being in the living room with him, but after that moment, he could not recall anything until he woke up in the field after the accident.

¶ 6 Two days later, Detectives Bohon and Bob Stieber interviewed Davis again. Initially, Davis repeated the story he had previously told Detective Bohon. As Stieber questioned Davis, his memory improved. He remembered Jody talking to him about religion and his commitment to Stacey. An angry Davis told Jody that there would be no commitment and the two argued. Davis claimed that Jody stood up while she continued her lecture and that he then stood up, got angry, accused her of being in his face and told her to "back up," pushing her backwards. Davis claimed Jody grabbed a knife and cut him on his thumb. Davis then hit Jody on the chin (apparently causing the fracture to her jawbone) and tried to grab the knife, getting cut in the process. Davis said he got the knife from Jody and told her to get back, stabbing her in the stomach. He stated that he and Jody began to wrestle down the hallway and that he stabbed Jody in the leg. Once in the bedroom, Davis told Jody to stop and he put the knife down. Jody asked Davis to let her go to which he agreed, but then Jody ran towards the knife. He grabbed the knife first and stabbed Jody on the left side. She then told Davis that she could not breathe and Davis told her to lie down on the bed. Davis said he tried to wrap her up tightly in the bedspread so she would not bleed to death. He claimed he heard her stop breathing, but then fell asleep. When he awoke, he panicked and fled in Jody's van so he could think about what to do. Shortly thereafter, the crash occurred. When Stieber confronted him with physical evidence showing Jody was strangled/choked, Davis conceded that he may have choked her while they were wrestling. However, he adamantly denied having consensual or non-consensual sex with her.

¶ 7 Davis told his girlfriend, Stacey Sanford, three different versions of what happened that morning. At first, he told her that he believed her mother was an intruder and that he instinctively fought with her to protect his family home. Several months later, he told Stacey that her mother came to their apartment and that the two of them argued because Davis believed Jody was lying about her knowledge of Stacey's whereabouts. He claimed he pushed Jody and Jody went to the kitchen and retrieved a knife. Davis said that he got his thumb cut when he tried to take the knife from Jody, and that once he got the knife, he stabbed Jody once in the stomach. The argument continued and the two of them ended up in the bedroom where Jody said let's end this and Davis put the knife down. He claimed that she grabbed the knife as she walked towards the door and that he took it from her and stabbed her again.

¶ 8 Two to three months later after DNA tests showed that Davis' semen was found in Jody's vagina, Stacey confronted Davis and he told her a third version of what had happened. In this third version, he said that Jody came to their apartment upset about her husband's infidelity. He claimed that he tried to comfort her and they ended up having consensual intercourse. After their sexual encounter, Davis said he was lying on the floor in the front room while Jody was in the kitchen and that all of a sudden he was struck in the back of the head with some object. He did not elaborate on the details of the stabbing, indicating that the events unfolded from there.

¶ 9 At trial, Davis testified that Jody came to his apartment after she could not locate Stacey and talked to him about his need to commit to her. Davis claimed he responded by making a remark about Jody's husband's level of commitment and his rumored infidelity. He said that Jody became emotional and acknowledged that she knew about her husband's affair. Davis said he felt badly about his remark and got up and sat beside Jody and tried to comfort her. He claimed that Jody kissed him and that they ended up going back to the bedroom and having sex on the bedroom floor for fifteen to twenty minutes. Afterwards Davis got up and stumbled between the hallway and bedroom. He said

that Jody was saying something about the time and he said that the sex was not worth his time and that he understood why Jody's husband was having an affair. He claimed that an angry Jody then hit him in the back of the head with a lotion dispenser, stunning him. As Jody walked by Davis, Davis got up and chased her down the hallway, tackling her and biting her ankle. Jody kicked Davis in the mouth and ran to the kitchen and grabbed a knife. Davis then ran to the living room and grabbed the Play Station II. Davis asked Jody "what the hell are you doing?" and hit her in the face. Davis said Jody "came back with a defensive position" and that he used the Play Station II as a shield. Now angrier, Davis hit Jody again and tossed the Play Station II into a nearby chair. He backed her down the hallway while she swung the knife wildly, cutting Davis on his arm. Davis went into the bathroom for a towel and Jody retreated to the bedroom. He said that when he exited the bathroom he saw Jody in the bedroom doorway and that he ran at her, grabbed her, pulled her down and hit her in the face two to three times. As they were fighting, Davis pushed Jody's head against the wall and struck her until she finally relinquished the knife. Jody retreated into the bedroom and asked Davis to let her go. Davis claimed he told Jody to go and put the knife on the nightstand. He said that when Jody walked by, she grabbed the knife, which angered him because he believed the fight was over. He then grabbed her shirt, pulled her towards him and put his arm around her neck squeezing as tightly as he could until she dropped the knife. He said that he grabbed the knife, that he was angry and that he stabbed Jody in the back. Jody then "swung back," struck him in the groin and he fell to one knee. He claimed Jody continued to hit him and that he stabbed her several times as he tried to fend off her attack. He maintained that he never intended to kill her. Other facts will be discussed as they become relevant to the propositions of error raised for review.

¶ 10 In his first proposition of error, Davis claims the trial court abused its discretion in allowing the testimony of State's witnesses, William Parr and Russell Busby, in rebuttal because their identity had not been disclosed during pre-trial discovery. He maintains the Oklahoma Criminal Discovery Code[3] (hereinafter "Code") abrogated the common law "no notice" rule regarding rebuttal witnesses and requires disclosure and endorsement of all known or reasonably anticipated witnesses, including rebuttal witnesses. Accordingly, Davis maintains admission of Parr's and Busby's testimony was error.[4] Because Davis objected to these witnesses on this basis, this claim has been preserved for review.

¶ 11 Title 22 O.S.2002, § 2002(A)(1)(a) requires the State to disclose upon the defense's request "the names and addresses of witnesses which the State intends to call at trial, together with their relevant, written or recorded statement, if any, or if none, significant summaries of any oral statement." Davis maintains that because the Code does not specifically exclude rebuttal witnesses from the State's compulsory disclosure duty and compels the defense to make known to the State the witnesses the defense intends to call at trial, § 2002(A)(1)(a) should be construed to require the State to include potential rebuttal witnesses in its endorsements and discovery materials to effectuate meaningful reciprocal discovery.

¶ 12 We have yet to consider the exact question presented, i.e., whether the Code has changed the common law rule and now requires the State to disclose the names and addresses of its rebuttal witnesses. To date, the Code's "intends to call at trial" language has been interpreted by this Court to include only those witnesses the State intends to call or reasonably anticipates calling in its case-

3. 22 O.S.Supp.2002, § 2002.

4. The record shows the State called five witnesses in rebuttal at the close of the defense's case-in-chief, three of which were endorsed as potential witnesses and are not the subject of this claim. Parr testified that he knew the victim for over ten years and that she had a peaceable character. Busby testified that he was qualified to conduct crime scene reconstruction and blood stain interpretation. Busby then gave his opinions about the crime scene, specifically contradicting certain portions of Davis' trial testimony.

in-chief to prove its case and to refute any known or anticipated defenses. In *Short v. State*, 1999 OK CR 15, 980 P.2d 1081, *cert.* denied, 528 U.S. 1085, 120 S.Ct. 811, 145 L.Ed.2d 683 (2000), the defendant sought to present a witness in his case-in-chief for whom no notice had been given under the Code. Short argued on appeal that the witness was a rebuttal witness for whom no notice was required as the witness was being offered to rebut testimony presented during the State's case-in-chief. *Short*, 1999 OK CR 15, ¶ 24, 980 P.2d at 1094. We found the witness was not a true rebuttal witness in the legal sense, noting every defense witness is a "rebuttal" witness to the State's case. *Short*, 1999 OK CR 15, ¶ 25, 980 P.2d at 1094. In so holding, we affirmed our position concerning notice of rebuttal witnesses, stating that "under usual trial proceedings, rebuttal is an opportunity for the State to present witnesses, **for whom no notice is required,** to rebut the defense case-in-chief." *Id.* (emphasis added) Thus, the *Short* Court found no modification by the enactment of the Code of the long-standing rule that the State is not required to endorse rebuttal witnesses.

¶ 13 This same position was taken in *Thornburg v. State*, 1999 OK CR 32, ¶ 27, 985 P.2d 1234, 1245, *cert. denied*, 529 U.S. 1113, 120 S.Ct. 1970, 146 L.Ed.2d 800 (2000) (post-Code case) and *Cheney v. State*, 1995 OK CR 72, ¶ 70, 909 P.2d 74, 91 (a case tried after this Court's promulgation of almost identical discovery rules in *Allen v. District Court of Washington County*), when this Court held trial counsel was not ineffective in failing to object to rebuttal testimony based on lack of notice or surprise because the State is not required to endorse its rebuttal witnesses.

¶ 14 We take this opportunity to clarify this Court's position on the issue of the notice required under the Code. There is nothing in the Code that explicitly rejects or revokes the long-established rule that the State need not give notice of its rebuttal witnesses. That said, we emphasize this Court's condemnation of parties who are not forthcoming with their respective discovery obligations. The purpose of our reciprocal discovery code is to provide for the adequate exchange of information to facilitate informed

pleas, to expedite trials, to minimize surprises/trial by ambush, to afford the parties the opportunity for effective cross-examination and to meet the requirements of due process. After all, the true purpose of a criminal trial is the ascertainment of the facts. We interpret the phrase "witnesses the State intends to call at trial" to mean a person or persons whom the State reasonably anticipates it is likely to call at trial, including those witnesses, especially experts, whose testimony is known or anticipated both prior to and after receipt of the defense's discovery materials.

¶ 15 No notice, however, is required for rebuttal witnesses. We recognize that a trial is not a scripted proceeding; rather, it is a process that ebbs and flows. Every lawyer and trial judge knows that during the trial process, things change and the best laid strategies and expectations may quickly become unsuitable: witnesses who have been interviewed vacillate or change their statements; events that did not loom large at preliminary hearing or throughout the pretrial proceedings may in reality become a focal point at trial. Thus, there must be some flexibility.

¶ 16 To ensure fairness, our trial courts are vested with the responsibility to determine whether proposed rebuttal witnesses are truly being offered to rebut evidence presented by the defense during its case-in-chief which could not be reasonably anticipated. If the so-called rebuttal witness is not a bona fide rebuttal witness, but rather a witness who could and should have been called in the State's case-in-chief and for whom no notice was given, the trial court should exclude the witness's testimony upon proper objection. If the rebuttal witness is offered to rebut specific evidence presented by the defense, the trial court should admit the testimony. We acknowledge there are conceivable circumstances where a failure to name a witness might be found to be a willful act designed to circumvent discovery rules. However, our existing rules as outlined above resolve the issue as well as the concerns raised by Davis of the nefarious prosecutor who deliberately withholds the names of witnesses the State intends to call at trial by labeling these witnesses as rebuttal wit-

nesses in an attempt to hide significant parts of the State's case and to ambush the defense. Moreover, any unfairness that results from a lack of notice of a true rebuttal witness can usually be remedied by a continuance. We have held that if an unendorsed witness' testimony will require a defendant to produce additional evidence or other rebuttal witnesses, the defendant is entitled to a continuance of sufficient time to prepare to defend against the rebuttal testimony. *Griffin v. State*, 1971 OK CR 492, ¶ 12, 490 P.2d 1387, 1389. Here, Davis did not request any continuance.

¶ 17 We must now decide if the trial court properly admitted Parr's and Busby's testimony in rebuttal. The State called both Parr and Busby specifically to rebut claims Davis made during his trial testimony of which the State had no notice and in which Davis repudiated his prior statements and gave yet a sixth version of the events that happened between Jody and him. At trial, Davis testified that Jody started the altercation by hitting him in the head with the lotion dispenser after he made disparaging remarks about her sexual performance. He portrayed Jody as the aggressor throughout much of the fight to support his self-defense and mutual combat theories. Such testimony made Parr's testimony of Jody's peaceable character relevant and admissible. Likewise, Busby's testimony was relevant to refute Davis' claims made for the first time during his trial testimony concerning the manner and locations of the knife attack that were different than his pre-trial statements. Based on this record, we find that the trial court did not abuse its discretion in allowing the rebuttal testimony of Parr and Busby. Therefore, no relief is required.

¶ 18 In his second proposition of error, Davis contends upholding and allowing the continuation of the long-standing "no notice" rule in modern criminal discovery violates a capital defendant's Sixth, Eighth and Fourteenth Amendment rights. According to Davis, it is unfair to allow the State to label an expert witness as a rebuttal witness when the expert's testimony can be reasonably expected or anticipated from the defense's disclosure duties under the Code. We agree that the State should disclose witnesses whose testimony is known or anticipated after the State receives the defense's discovery materials. However, that is not the situation presented in this case.

¶ 19 Davis notes in several instances in his brief that the defense is not required under the Code to give notice of the defendant's own anticipated testimony if he chooses to testify. Here, the State had not been given any notice or indication prior to trial that Davis would testify.[5] Nor did the defense reveal which, if any, of his prior statements he would advocate at trial or whether he would present a different version of the fateful events as he did. Under these circumstances, the State could not reasonably anticipate what rebuttal evidence would be relevant until Davis testified.

¶ 20 Interestingly, Davis maintains the State knew or should have reasonably anticipated that it would call a crime scene reconstructionist because Davis had made statements about the location and circumstances of the knife attack from the beginning. Yet, he claims unfair surprise by this same witness whose necessity should have been so obvious to the prosecution. He maintains that the defense was unprepared to refute Busby's qualifications and conclusions due to the lack of notice of such a potential rebuttal witness. We find this assertion somewhat disingenuous. The defense was well aware of the State's right to present rebuttal evidence and the very real possibility the State would attempt to rebut Davis' trial testimony. Had Davis not taken the stand or changed his story, Busby's testimony would have been inadmissible in rebuttal. Davis has no legitimate constitutional claim that his rights were violated when it was he who elected to take the stand and offer yet another version of the events that attempted to account for the State's evidence, but that the State could ultimately discredit in rebuttal. Based on this record, we find that Davis'

5. The record shows the prosecutor did not engage Busby to conduct any crime scene reconstruction/investigation until the second day 'of trial when defense counsel announced during *voir dire* that Davis would testify.

constitutional rights were not violated by the lack of notice of Busby's testimony.

¶ 21 Davis claims in his third proposition that his first-degree murder conviction must be reversed because the trial evidence was insufficient to prove beyond a reasonable doubt that he intended to kill Jody Sanford. Davis relies on his trial testimony to argue the evidence showed that the parties engaged in mutual combat, that it was Sanford who introduced the knife into the fight and that, at most, he is guilty of heat of passion manslaughter.

¶ 22 In reviewing sufficiency challenges, we review the direct and circumstantial evidence, crediting all inferences that could have been drawn in the State's favor, to determine if any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt. *Black v. State*, 2001 OK CR 5, ¶ 34, 21 P.3d 1047, 1062, *cert. denied*, 534 U.S. 1004, 122 S.Ct. 483, 151 L.Ed.2d 396 (2001); *Spuehler v. State*, 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203–04. "Pieces of evidence must be viewed not in isolation but in conjunction, and we must affirm the conviction so long as, from the inferences reasonably drawn from the record as a whole, the jury might fairly have concluded the defendant was guilty beyond a reasonable doubt." *Matthews v. State*, 2002 OK CR 16, ¶ 35, 45 P.3d 907, 919–20, *cert. denied*, 537 U.S. 1074, 123 S.Ct. 665, 154 L.Ed.2d 570 (2002).

¶ 23 To prove malice aforethought murder, the State must show the defendant acted with a deliberate intention to take the life of the victim without justification. *Black*, 2001 OK CR 5, ¶ 35, 21 P.3d at 1062. This intent may be formed instantly before committing the homicidal act. 21 O.S.2001, § 703. The law infers a design to effect death from the fact of killing unless the circumstances raise a reasonable doubt that such design existed. 21 O.S.2001, § 702. When direct evidence of a person's intent is lacking, jurors must rely on circumstantial evidence to ascertain the person's intent at the time of the homicidal act. *Black*, 2001 OK CR 5, ¶ 35, 21 P.3d at 1062.

¶ 24 The record shows Davis received jury instructions on the lesser-related offense of first-degree heat of passion manslaughter and the defenses of self-defense and voluntary intoxication. The jury heard the evidence, including Davis' trial testimony, and rejected his claim that he was engaged in mutual combat and that he stabbed Sanford in a heat of passion. The jury's verdict is supported by the record. All of Davis' accounts of his encounter with Sanford that early morning were discredited in some form or fashion. At trial, Davis repudiated his five statements made prior to trial, claiming he had lied to spare/protect the Sanford family as well as his own family. He testified his trial version was the truth. However, Russell Busby, the crime scene reconstructionist, testified that the blood patterns in the back bedroom were inconsistent with Davis' trial version of the events that Sanford was standing in the back bedroom while she was being stabbed. The jury was free to consider the fact that Davis changed his story to fit the facts as he learned them in evaluating his credibility. The fact that Davis' statements and his trial testimony were inconsistent with each other and with the physical evidence was a relevant consideration in determining his truthfulness and ultimately his guilt. *See McElmurry v. State*, 2002 OK CR 40, ¶ 42, 60 P.3d 4, 19.

¶ 25 The uncontroverted evidence showed Davis called Sanford in the early morning hours of November 4th looking for Stacey and his daughter. Despite being told they were not there, he called again within fifteen minutes and thereafter Sanford left her home and ended up at Davis' apartment. Later that morning, Sanford was found dead, half-naked, bruised and stabbed multiple times. Around the same time, Davis was involved in a serious accident that occurred as he was driving Sanford's van some nine miles away from his apartment. The jury could easily have concluded the events unfolded more like Davis described in his second statement in which Davis admitted getting mad at Sanford after she lectured him on commitment and church. He started the fight with Sanford because he felt she was in his "face" and that she was not being truthful about Stacey's whereabouts. This statement provided the

plausible motive in this case. The jury had legitimate reasons to disbelieve Davis' claims that he never intended to kill Sanford in light of the severity of her stab wounds and other injuries and his inconsistent stories about the events. Based on this record, we find the evidence was sufficient to sustain the verdict.

¶ 26 In his fourth proposition, Davis claims the trial court committed reversible error when it refused the uniform instructions he requested on the definition of circumstantial evidence and the need for circumstantial evidence to exclude reasonable theories of innocence. The record shows these instructions were not discussed during the instruction conference. Rather, defense counsel requested them just before the jury retired to deliberate and the trial court denied the request.

¶ 27 "An instruction on circumstantial evidence is only required when the State's evidence consists of entirely circumstantial evidence." *Wade v. State*, 1992 OK CR 2, ¶ 19, 825 P.2d 1357, 1362. When the State relies on both direct and circumstantial evidence for its proof, the jury need not be specially instructed of circumstantial proof. *Roubideaux v. State*, 1985 OK CR 105, ¶ 24, 707 P.2d 35, 39. Here, the State's case was not entirely circumstantial as there was direct evidence Davis killed Sanford. Simply because one of the elements is proved by circumstantial evidence does not make the case an entirely circumstantial case. A review of the record shows the instructions given correctly stated the applicable law and included all of Davis' theories of defense. Accordingly, we find the trial court did not abuse its discretion in denying Davis' late request for these circumstantial evidence instructions.

¶ 28 In his fifth proposition of error, Davis claims the trial court abused its discretion when it prohibited him from questioning Tom Sanford, Stacey Sanford and Raymond Pollard, about Tom Sanford's alleged extra-marital affair, arguing such evidence was relevant to Jody Sanford's state of mind that fateful morning and would have supported his claim that the sexual encounter between them was consensual. He maintains the trial court's ruling denied him his constitutional right to confront witnesses against him and his right to compulsory process.

¶ 29 Before calling Tom Sanford to testify, the State moved *in limine* to prohibit the defense from questioning him about whether or not he had engaged in an extra-marital affair. The State argued that Tom Sanford's participation in any extra-marital affair was not relevant to the case. The defense argued it had the right to address the subject since the State had presented evidence of it through Stacey Sanford [6] and such evidence was relevant to Jody Sanford's state of mind to show whether she would have given consent to have sex with Davis. The State responded that it had not offered evidence that an affair had actually taken place, only that Davis had told Stacey that her mother was upset about an affair. The trial court ruled that evidence of an actual affair was not relevant, but even if it were, the prejudicial effect outweighed any probative value it might have had.

¶ 30 It is well established that the scope of cross-examination and the admission of evidence lie in the sound discretion of the trial court, whose rulings will not be disturbed unless that discretion is clearly abused, resulting in manifest prejudice to the accused. *Williams v. State*, 2001 OK CR 9, ¶ 94, 22 P.3d 702, 724, *cert. denied*, 534 U.S. 1092, 122 S.Ct. 836, 151 L.Ed.2d 716 (2002); *Reeves v. State*, 1991 OK CR 101, ¶ 30, 818 P.2d 495, 501. There is no such abuse of discretion in the present case. Whether Jody Sanford had heard a rumor of an affair and whether she believed it as true would not have been rendered more or less probable by the admission of evidence indicating whether or not Tom Sanford had actually engaged in an extra-marital affair. The issue was Jody Sanford's existing state-of-mind to which Davis testified. Davis repeated his claim

6. Stacey had earlier testified about Davis' third statement to her in which he admitted, after being confronted with DNA evidence, to having sex with her mother before he killed her. Davis told Stacey that her mother was upset about her husband cheating on her and that Davis' attempts to comfort her led to consensual sexual intercourse.

under oath that Sanford was upset about her husband's alleged affair in support of his claim that they had consensual sex. Therefore, evidence from Sanford that he actually engaged in an affair was not relevant to the issues in controversy.

¶ 31 The same is true for Raymond Pollard and Stacey Sanford. The defense sought to question Pollard in its case-in-chief about seeing Tom Sanford in the company of a woman, not his wife. Such evidence was irrelevant to the issue of consent or Sanford's state of mind at the time of her death. Likewise, the defense wanted to ask Stacey if she had heard the rumors Davis had heard about her father being involved in an extra-marital affair and whether she knew if her mother had heard or knew of the rumors. Defense counsel did not indicate that he had any knowledge to support an offer of proof that Stacey knew her mother was aware of any alleged affair and was affected by it in the days before her death. Based on this record, it cannot be said the trial court abused its discretion in limiting defense counsel's questioning of these witnesses. Accordingly, we find this claim has no merit.

¶ 32 In his sixth proposition of error, Davis contends the introduction of his statements to Detective Bohon and Detective Stieber violated his Fifth Amendment rights because the State failed to prove by a preponderance of the evidence that he knowingly and voluntarily waived his right to remain silent/privilege against self-incrimination. He also claims, as he did below, that his statement was not voluntary within the meaning of the Due Process Clause of the Fourteenth Amendment due to the coercive police tactics utilized in obtaining the statement from a person in his condition.

¶ 33 Voluntariness of a confession is judged from the totality of the circumstances, including the characteristics of the accused and the details of the interrogation. *Van White v. State*, 1999 OK CR 10, ¶ 45, 990 P.2d 253, 267; *Lewis v. State*, 1998 OK CR 24, ¶ 34, 970 P.2d 1158, 1170, *cert. denied*, 528 U.S. 892, 120 S.Ct. 218, 145 L.Ed.2d 183

(1999). *See also Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410, 421 (1986). For a waiver of rights to be effective, the State must show by a preponderance of the evidence that the waiver was the product of a free and deliberate choice rather than intimidation, coercion, or deception and that the waiver was made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. *Lewis*, 1998 OK CR 24, ¶ 34, 970 P.2d 1158, 1170; *Smith v. State*, 1996 OK CR 50, ¶ 16, 932 P.2d 521, 529, *cert. denied*, 521 U.S. 1124, 117 S.Ct. 2522, 138 L.Ed.2d 1023 (1997).

¶ 34 The trial court held a *Jackson v. Denno*[7] hearing to consider Davis' objection that his waiver of rights and subsequent statement were involuntary. It found, after considering the totality of the circumstances, that the question of the voluntariness of Davis' waiver was a fact question to be resolved by the jury and that a finding of involuntariness as a matter of law was not justified. This Court will not reverse a trial court's ruling where the trial court's decision to admit a statement is supported by competent evidence of the voluntary nature of the statement. *Bryan v. State*, 1997 OK CR 15, ¶ 17, 935 P.2d 338, 352, *cert. denied*, 522 U.S. 957, 118 S.Ct. 383, 139 L.Ed.2d 299 (1997).

¶ 35 The evidence supports the trial court's finding that Davis' waiver of rights and subsequent statements were voluntary and therefore admissible. At the *Jackson v. Denno* hearing, the State presented the testimony of both Detectives Bohon and Stieber. The State also provided the court with transcripts of both interviews. Detective Bohon testified that before he interviewed Davis the first time on November 4th, he consulted hospital medical staff about what, if any, medications Davis had been or was taking and the best time to speak with him to ensure Davis would be coherent and free from the influence of any medications. Bohon testified that prior to any questioning, he read Davis his *Miranda* warning from the standard printed sheet, including the two waiver questions. Bohon said that Davis

7. *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) established a defendant's right to an *in camera* hearing on the voluntariness of his confession.

responded affirmatively when asked if he understood his rights and appeared to do so. Davis then agreed to tell Bohon what he could remember. Bohon testified that during the interview Davis was conscious and did not appear to be under the influence of any type of drug or alcohol. His speech was not slurred and he gave understandable and reasonable responses to the questions posed. Furthermore, Davis appeared oriented to time and place. Bohon did not threaten, force, pressure or promise Davis anything in order to get him to make a statement. Bohon characterized the conversation as "cordial" and "pretty open." A review of the transcript confirms Bohon's testimony.

¶ 36 Detectives Bohon and Stieber followed the same protocol when they interviewed Davis on November 6th. Bohon again conferred with hospital medical staff about Davis' medication regimen and its effects on him so Davis would be lucid and clear-headed during anticipated questioning. Prior to any questioning, Stieber read to Davis the *Miranda* warning from his *Miranda* card and asked Davis if he understood his rights and wanted to talk with him. Davis said that he understood his rights and that he would answer what he could. At no time during the interview did Davis indicate that he wanted to terminate the interview or consult a lawyer. Davis appeared to understand all questions asked and gave appropriate responses to the questions posed. The specificity of detail Davis was able to provide and the back and forth nature of the interview demonstrated that he was fully alert and comprehended what others said to him, thereby supplying strong evidence that he understood his rights as presented to him as well.

¶ 37 In addition, a review of both interviews shows that Davis' statements were not extracted or coerced by the exertion of improper influence. This is especially true of Davis' first statement since he did not confess and claimed he had no memory of what had happened. The record does reveal that during the second interview in which Davis ultimately confessed, Stieber did use phrases like "cold blooded killer" and "cold blooded bastard" to spur Davis to provide details of the events that culminated in Sanford's death. The comments complained of were not coercive in nature; the detectives neither threatened Davis nor implied promises of benefits or leniency. Rather, the detectives explained to Davis that the evidence showed that he was responsible for Sanford's death, leaving them to conclude that he either planned it and carried it out making him a cold blooded killer or that some unplanned fight erupted and Sanford was stabbed and killed. Only Davis could provide the answer and they encouraged him to do so. After reviewing the totality of the circumstances, we find the trial court did not err in its ruling. Accordingly, no relief is required.

¶ 38 In his seventh proposition of error, Davis contends the trial evidence was insufficient to support the jury's finding that Sanford's murder was especially heinous, atrocious or cruel. Acknowledging Sanford's injuries, he maintains that these wounds were inflicted either entirely or in large measure under circumstances of mutual combat and that the aggravating circumstance only applies to those acts which occur after the intent to kill is formed. Davis submits that because we cannot know at what moment the intent to kill was formed under the evidence presented, we must find the evidence of this aggravating circumstance insufficient. We disagree.

¶ 39 This Court upholds a jury's finding of this aggravating circumstance when it is supported by proof of conscious serious physical abuse or torture prior to death; evidence that a victim was conscious and aware of the attack supports a finding of torture. *Black*, 2001 OK CR 5, ¶ 79, 21 P.3d at 1074. As discussed in Proposition 3, *supra*, the evidence was sufficient for a rational jury to conclude that Davis intentionally killed Sanford, his statements notwithstanding. The jury rejected Davis' self defense and mutual combat theories. There was evidence of a struggle during which Davis stabbed Sanford six times penetrating vital organs. She later died from the blood loss associated with these wounds. Davis also beat Sanford, broke her jaw and attempted to choke her as evidenced by the petechiae in her eyes. Sanford was found naked from the waist down and her shirt and bra were

pushed up over her breasts. She had a bite mark on her ankle and a possible bite mark on her thigh. Davis' sperm was found in her vagina and the jury concluded Davis raped Sanford at some point during the attack. In his many statements, Davis never claimed Sanford was unconscious until sometime after she had been stabbed. Evidence of such an assault and rape on a 52–year–old woman standing 4'11" by a young man standing 5'10" weighing 245 lbs. accompanied by Sanford's injuries would allow a rational jury to conclude that Davis intended to kill Sanford when he stabbed her six times and that he inflicted trauma causing conscious serious physical abuse or torture prior to Sanford's death. Therefore, we find the evidence, when viewed in the light most favorable to the State, was sufficient to find beyond a reasonable doubt that Sanford's murder was especially heinous, atrocious or cruel. *Black,* 2001 OK CR 5, ¶ 79, 21 P.3d at 1074.

¶ 40 In his eighth proposition of error, Davis claims he was denied a fair trial by the admission of prejudicial, irrelevant and privileged marital communications consisting of statements both oral and written he made to Stacey Sanford while awaiting trial. The record shows that Davis did not object to much of the evidence about which he now complains and that the trial court overruled the objections he did make, finding Davis had not proved the existence of a common law marriage.

¶ 41 The marital privilege, set forth at 12 O.S.2001, § 2504, applies equally to common law and ceremonial marriages. *Blake v. State,* 1988 OK CR 272, ¶ 4, 765 P.2d 1224, 1225 (quoting K. McKinney, Privileges, 32 Okla.L.Rev. 307, 326 (1979)). However, before an accused can take advantage of the marital privilege to exclude evidence, he or she must first prove, by clear and convincing evidence, the existence of a valid marriage. *Blake,* 1988 OK CR 272, ¶ 4, 765 P.2d at 1225. To establish a valid common law marriage, there must be evidence of an actual mutual agreement between the spouses to be husband and wife, a permanent relationship, an exclusive relationship—proved by cohabitation as man and wife, and the parties to the

marriage must hold themselves out publicly as man and wife. *Id.*

¶ 42 Although Stacey Sanford and Davis lived and had children together, Stacey Sanford described her relationship with Davis as boyfriend and girlfriend. She testified that it was Davis who told her parents she was pregnant with their second child because she was afraid her parents would be angry with her for getting pregnant again without her and Davis being married. She further testified that Davis had talked with her mother about marrying her. In his November 6th interview with detectives, Davis told them Sanford came to his apartment and started lecturing him about the need for Davis and Stacey to commit. He and Stacey were having some problems at that time, but Davis said they were working things out and were "going to get married and all of that." At trial, Davis described Stacey as his fiancé and mother of his children. When asked if the two of them had held each other out as husband and wife, Davis stated "[j]ust as—as far as engagement, that's about it, common law married." Later in his testimony, Davis testified that he and Stacey were having problems and that they had been engaged in the past, but were not at the time of Sanford's death. The foregoing testimony presented at trial was insufficient to establish the elements of a valid common law marriage by clear and convincing evidence. Accordingly, we find the trial court did not err in allowing evidence of Davis' statements to Stacey Stanford at trial over Davis' marital privilege objection.

¶ 43 In addition, Davis' claim that the evidence was irrelevant and unduly prejudicial is without merit. Davis' pre-trial statements explaining the events of that morning to Stacey and his letters to her urging her to stand by him were unquestionably relevant to the issues in dispute and to Davis' credibility. Such evidence was not unfairly prejudicial. Accordingly, we find the trial court did not abuse its discretion in admitting the complained-of evidence. *Williams,* 2001 OK CR 9, ¶ 94, 22 P.3d at 724.

¶ 44 In his final proposition of error, Davis claims his death sentence should be vacated

or modified because the aggravating circumstances were not charged in an information or indictment, were not subjected to adversarial testing at a preliminary hearing, and were therefore not determined to probably exist by a neutral and detached magistrate. Thus, Davis claims the District Court never acquired jurisdiction over the aggravating circumstances.

¶ 45 Davis relies upon the United States Supreme Court's holdings in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Under these cases and the Supreme Court's interpretation of them in *Sattazahn v. Pennsylvania*, 537 U.S. 101, 123 S.Ct. 732, 154 L.Ed.2d 588 (2003), Davis maintains aggravating circumstances "operate as the functional equivalent of an element of a greater offense." *See Ring*, 536 U.S. at 609, 122 S.Ct. at 2443, *quoting from Apprendi*, 530 U.S. at 494, n. 19, 120 S.Ct. 2348. Thus, Davis contends, aggravating circumstances-as the functional equivalent of an element of a greater offense-must be charged in an indictment or information and then be presented and established at a preliminary hearing for a death sentence to be constitutionally sound.

¶ 46 We have previously rejected this claim. *Primeaux v. State*, 2004 OK CR 16, ¶¶ 14–16, 88 P.3d 893, 899–900, *cert. denied*, ── U.S. ──, 125 S.Ct. 371, 160 L.Ed.2d 257 (2004). *See also Thacker v. State*, 2004 OK CR 32, ¶¶ 9–23, 100 P.3d 1052. We find these cases dispositive. Accordingly, no relief is required.

## MANDATORY SENTENCE REVIEW

¶ 47 Pursuant to 21 O.S.2001, § 701.13(C), we must now determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and (2) whether the evidence supports the jury's finding of aggravating circumstances as enumerated in 21 O.S.2001, § 701.12. In regard to the first inquiry, we find that Davis' death sentence did not result from passion, prejudice or other arbitrary factor. In regard to the second inquiry, the jury was instructed on the three aggravating circumstances alleged and found the existence of only one aggravating circumstance: (1) that the murder was especially heinous, atrocious or cruel.[8] As discussed in Proposition 7, we find that this aggravating circumstance is supported by sufficient evidence. Additionally, the jury was instructed on ten (10) specific mitigating circumstances [9] and instructed to consider any other mitigating circumstances that were present. Upon reviewing the record, we find that the aggravating circumstance outweighed the mitigating circumstances and that Davis' death sentence is factually substantiated and appropriate. Accordingly, the Judgment and Sentence of the trial court is **AFFIRMED.**

JOHNSON, P.J., LUMPKIN and CHAPEL, JJ.: concur.

LILE, V.P.J.: concur in result.

---

**8.** The jury rejected the following aggravators: 1) Davis committed the murder for the purpose of avoiding or preventing a lawful arrest or prosecution; and 2) the existence of a probability that Davis would commit criminal acts of violence that would constitute a continuing threat to society. 21 O.S.2001, §§ 701.12(5) & (7)

**9.** These included: 1) Davis did not have any significant history of prior violent criminal activity; 2) Davis' capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law; 3) Davis was under the influence of mental/emotional disturbance; 4) Davis acted under circumstances which tended to justify, excuse or reduce the crime; 5) Davis is likely to be rehabilitated; 6) Davis cooperated with authorities; 7) Davis' age; 8) Davis' character; 9) Davis' emotional/family history; and 10) Davis was a model inmate while in jail and has positively influenced other inmates.