**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 28, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

BRIAN DARRELL DAVIS,

Petitioner - Appellant,

v.

RANDALL G. WORKMAN, Warden,
Oklahoma State Penitentiary,

Respondent - Appellee.

No. 11-6022

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 5:06-CV-00139-R)**

Jack Fisher, Fisher Law Office, Edmond, Oklahoma, (Lanita Henricksen,
Henricksen & Henricksen Lawyers, Inc., Oklahoma City, Oklahoma, with him on
the briefs), for Petitioner - Appellant.

Jennifer L. Crabb, Assistant Attorney General, (E. Scott Pruitt, Attorney General
of Oklahoma, with her on the brief), Office of the Attorney General for the State
of Oklahoma, Oklahoma City, Oklahoma, for Respondent - Appellee.

Before **KELLY**, **MURPHY**, and **HARTZ**, Circuit Judges.

**HARTZ**, Circuit Judge.

An Oklahoma jury convicted Defendant Brian Darrell Davis of the first-

degree murder and rape of Josephine "Jody" Sanford, the mother of his girlfriend

Stacey Sanford. On the recommendation of the jury, Defendant received a 100-year prison sentence for the rape and a death sentence for the murder.

After unsuccessfully appealing to the Oklahoma Court of Criminal Appeals (OCCA), *see Davis v. State*, 103 P.3d 70, 83 (Okla. Crim. App. 2004), and pursuing postconviction relief in state court, *see Davis v. State*, 123 P.3d 243, 249 (Okla. Crim. App. 2005), Defendant unsuccessfully sought relief under 28 U.S.C. § 2254 in the United States District Court for the Western District of Oklahoma. The district court denied a certificate of appealability (COA) but this court granted a COA on two issues: whether Defendant's statements to police officers while he was hospitalized were knowing, intelligent, and voluntary; and whether his counsel was ineffective in failing to present scientific evidence that he was impaired while making those statements. *See* 28 U.S.C. § 2253(c)(1)(A) (requiring a COA to appeal the denial of a § 2254 application). We affirm on these issues because the OCCA did not unreasonably determine the facts or unreasonably apply federal law in rejecting these claims. We also deny Defendant's Motion for Additional Issues in COA because no reasonable jurist could dispute the district court's resolution of the issues raised in the motion. We do, however, grant a COA on a claim that Defendant apparently thought was encompassed by our prior grant of a COA—namely, the claim that his counsel was ineffective for failing to argue that police officers coerced him into making

-2-

his hospital statements by withholding pain medication.  But we affirm the denial of the claim.

I.    BACKGROUND

A.    Factual Background

The OCCA's decision on direct appeal offers a detailed description of the pertinent events:

> In the early morning hours of November 4, 2001, Davis returned home after socializing with some friends at a local club, only to find his girlfriend, Stacey Sanford, and their three-year-old daughter missing.  He telephoned Josephine "Jody" Sanford, Stacey's mother, to ask if she had seen or knew of their whereabouts.  Jody told Davis that she did not know where they were.  Ten to fifteen minutes later, Davis again telephoned Jody and asked her to go and find them.  When Jody could not locate her daughter and granddaughter, she went to Stacey's and Davis's apartment.
>
> Davis made several conflicting statements about the events that followed once Jody arrived, including a different version during his trial testimony.  However, with the exception of his first statement where he claimed to have no memory of what had happened, Davis admitted in his other statements that he fatally stabbed Jody.  Jody's body was discovered shortly after 9:00 a.m. when her daughter Stacey returned home.  Stacey immediately called 911 and local police arrived to investigate.
>
> Meanwhile, Davis had been involved in a single-car accident while driving Jody's van near the Salt Fork River Bridge.  Davis was seriously injured after he was ejected from the van through the front windshield.  Davis was transported to a local hospital for treatment.  Because there was an odor of alcohol about him, Davis was placed under arrest and his blood alcohol level was tested and registered .09%.  Later on, Davis was transported to a Witchita [sic] hospital for further care.
>
> Detective Donald Bohon interviewed Davis around 5:49 p.m. that afternoon.  In his first statement, Davis was able to recount his activities at the club the night before, but could not remember who drove him home.  He recalled that Stacey and his daughter were not

at home when he arrived and he remembered telephoning Jody. He could remember Jody being in the living room with him, but after that moment, he could not recall anything until he woke up in the field after the accident.

Two days later, Detectives Bohon and Bob Stieber interviewed Davis again. Initially, Davis repeated the story he had previously told Detective Bohon. As Stieber questioned Davis, his memory improved. He remembered Jody talking to him about religion and his commitment to Stacey. An angry Davis told Jody that there would be no commitment and the two argued. Davis claimed that Jody stood up while she continued her lecture and that he then stood up, got angry, accused her of being in his face and told her to "back up," pushing her backwards. Davis claimed Jody grabbed a knife and cut him on his thumb. Davis then hit Jody on the chin (apparently causing the fracture to her jawbone) and tried to grab the knife, getting cut in the process. Davis said he got the knife from Jody and told her to get back, stabbing her in the stomach. He stated that he and Jody began to wrestle down the hallway and that he stabbed Jody in the leg. Once in the bedroom, Davis told Jody to stop and he put the knife down. Jody asked Davis to let her go to which he agreed, but then Jody ran towards the knife. He grabbed the knife first and stabbed Jody on the left side. She then told Davis that she could not breathe and Davis told her to lie down on the bed. Davis said he tried to wrap her up tightly in the bedspread so she would not bleed to death. He claimed he heard her stop breathing, but then fell asleep. When he awoke, he panicked and fled in Jody's van so he could think about what to do. Shortly thereafter, the crash occurred. When Stieber confronted him with physical evidence showing Jody was strangled/choked, Davis conceded that he may have choked her while they were wrestling. However, he adamantly denied having consensual or non-consensual sex with her.

Davis told his girlfriend, Stacey Sanford, three different versions of what happened that morning. At first, he told her that he believed her mother was an intruder and that he instinctively fought with her to protect his family home. Several months later, he told Stacey that her mother came to their apartment and that the two of them argued because Davis believed Jody was lying about her knowledge of Stacey's whereabouts. He claimed he pushed Jody and Jody went to the kitchen and retrieved a knife. Davis said that he got his thumb cut when he tried to take the knife from Jody, and that once he got the knife, he stabbed Jody once in the stomach. The

argument continued and the two of them ended up in the bedroom where Jody said let's end this and Davis put the knife down.  He claimed that she grabbed the knife as she walked towards the door and that he took it from her and stabbed her again.

Two to three months later after DNA tests showed that Davis' semen was found in Jody's vagina, Stacey confronted Davis and he told her a third version of what had happened.  In this third version, he said that Jody came to their apartment upset about her husband's infidelity.  He claimed that he tried to comfort her and they ended up having consensual intercourse.  After their sexual encounter, Davis said he was lying on the floor in the front room while Jody was in the kitchen and that all of a sudden he was struck in the back of the head with some object.  He did not elaborate on the details of the stabbing, indicating that the events unfolded from there.

At trial, Davis testified that Jody came to his apartment after she could not locate Stacey and talked to him about his need to commit to her.  Davis claimed he responded by making a remark about Jody's husband's level of commitment and his rumored infidelity.  He said that Jody became emotional and acknowledged that she knew about her husband's affair.  Davis said he felt badly about his remark and got up and sat beside Jody and tried to comfort her.  He claimed that Jody kissed him and that they ended up going back to the bedroom and having sex on the bedroom floor for fifteen to twenty minutes.  Afterwards Davis got up and stumbled between the hallway and bedroom.  He said that Jody was saying something about the time and he said that the sex was not worth his time and that he understood why Jody's husband was having an affair.  He claimed that an angry Jody then hit him in the back of the head with a lotion dispenser, stunning him.  As Jody walked by Davis, Davis got up and chased her down the hallway, tackling her and biting her ankle.  Jody kicked Davis in the mouth and ran to the kitchen and grabbed a knife.  Davis then ran to the living room and grabbed the Play Station II.  Davis asked Jody "what the hell are you doing?" and hit her in the face.  Davis said Jody "came back with a defensive position" and that he used the Play Station II as a shield.  Now angrier, Davis hit Jody again and tossed the Play Station II into a nearby chair.  He backed her down the hallway while she swung the knife wildly, cutting Davis on his arm.  Davis went into the bathroom for a towel and Jody retreated to the bedroom.  He said that when he exited the bathroom he saw Jody in the bedroom doorway and that he ran at her, grabbed her, pulled her down and hit her in the face two to

three times.  As they were fighting, Davis pushed Jody's head against the wall and struck her until she finally relinquished the knife.  Jody retreated into the bedroom and asked Davis to let her go.  Davis claimed he told Jody to go and put the knife on the nightstand.  He said that when Jody walked by, she grabbed the knife, which angered him because he believed the fight was over.  He then grabbed her shirt, pulled her towards him and put his arm around her neck squeezing as tightly as he could until she dropped the knife.  He said that he grabbed the knife, that he was angry and that he stabbed Jody in the back.  Jody then "swung back," struck him in the groin and he fell to one knee.  He claimed Jody continued to hit him and that he stabbed her several times as he tried to fend off her attack.  He maintained that he never intended to kill her.

*Davis*, 103 P.3d at 73–75.

## B.    Proceedings Below

Defendant's § 2254 application asserted 14 claims:  (1) that Defendant did not understand his *Miranda* waiver and that his later statements to the police at the hospital were coerced by officers calling him a cold-blooded killer; (2) that his counsel was ineffective in failing to present scientific evidence that Defendant was impaired while making statements to the police; (3) that Defendant's counsel was ineffective in failing to argue that his hospital statements to police were the product of coercion caused by withholding of pain medication; (4) that the State's presentation of rebuttal witnesses without pretrial notice violated due process; (5) that presentation of the rebuttal witnesses violated his rights under the Sixth, Eighth, and Fourteenth Amendments; (6) that the conviction of first-degree murder was not supported by sufficient evidence; (7) that the state court's refusal to give instructions on circumstantial evidence violated the Sixth, Eighth, and

-6-

Fourteenth Amendments; (8) that the court denied his right to confront witnesses and to compulsory process by restricting evidence of the affair of the victim's husband; (9) that the cumulative impact of errors rendered the state-court proceedings fundamentally unfair; (10) that the jury's finding that the murder was especially heinous, atrocious, or cruel was not supported by sufficient evidence; (11) that his counsel was ineffective in failing to challenge the discriminatory use of peremptory challenges during jury selection; (12) that the state court erred in failing to make adequate findings after its hearing on the motion to suppress Defendant's statements to the police, and that his counsel was ineffective in failing to assert that the lack of adequate findings violated due process; (13) that the state court erred in allowing the introduction of Defendant's privileged communications to Stacey Sanford; and (14) that the state court did not have jurisdiction to consider the aggravating circumstances set forth in a bill of particulars because they were not properly charged.

In this court Defendant sought a COA on claims 1 to 12, and we granted a COA on claims 1 and 2: "[w]hether [Defendant's] statements made to police officers while hospitalized were knowingly, intelligently, and voluntarily made"; and "whether [Defendant] was denied effective representation by counsel in the trial court when counsel did not present scientific evidence that appellant was impaired and unable to understand the events surrounding the making of those statements." Case Management Order at 1, *Davis v. Workman*, No. 11-6022 (10th

Cir. May 3, 2011). He then renewed his request for a COA, but only on claims 4 to 9, although, as we discuss more fully later, he apparently thinks that he obtained a COA on claim 3. We affirm the district court's rulings on claims 1 and 2; grant a COA on claim 3 but deny relief; and again deny a COA on claims 4 to 9. We will address the claims in that order after first stating our standard of review.

## II.    STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), our review in a § 2254 proceeding is highly deferential. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). For claims adjudicated on the merits in state court, a federal court can grant relief only if the state-court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). As the Supreme Court has explained:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010) (internal quotation marks omitted). "Indeed, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* (internal quotation marks omitted). In addition, AEDPA requires deference to the state court's findings of fact. We presume those findings to be correct, and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## III. ISSUES ON WHICH WE PREVIOUSLY GRANTED A COA

### A. Admissibility of Statements During Hospitalization

On November 4, 2001, the same day that Jody Sanford was found dead in Defendant's home in Ponca City, Oklahoma, Defendant was seriously injured in a one-car accident and transported to a hospital for treatment. He was placed under arrest for driving under the influence of alcohol before being transferred to a regional hospital in Wichita, Kansas. He arrived by 12:40 p.m. and was interviewed about five hours later by Detective Donald Bohon. Two days later, on November 6, Detectives Bohon and Bob Stieber interviewed him again. At the beginning of each interview, he received *Miranda* warnings and waived his rights.

-9-

The State does not contest that Defendant was in custody while he made statements to the police on these two occasions.

Statements to the police during a custodial interrogation are inadmissible if the defendant did not waive his *Miranda* rights knowingly and voluntarily. *See Berghuis v. Thompkins*, 130 S. Ct. 2250, 2260 (2010). Whether the waiver was valid is a mixed question of law and fact. *See Mitchell v. Gibson*, 262 F.3d 1036, 1059 (10th Cir. 2001). "The inquiry has two distinct dimensions." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). As the Supreme Court explained:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Id.* (internal quotation marks omitted).

Defendant advances two arguments to contest the validity of his *Miranda* waiver. We first address his argument that his narcotic medication prevented him from knowingly and intelligently waiving his rights. We then address his coercion argument.

### 1. Effects of Medication

Defendant contends that his morphine medication kept him from being fully aware of the rights being abandoned during the second hospital interview. He

-10-

points out (1) that he testified at trial that he was "half-asleep" with his eyes closed when the police read him his *Miranda* rights at the beginning of the interview, Aplt. Br. at 61; (2) that one of the officers acknowledged the possibility that Defendant was in a "medicated sleep" when he was approached for the interview, *id.* at 62; and (3) that an affidavit submitted in postconviction proceedings by a defense expert, Dr. Thomas Kupiec, states that "it is certainly plausible to expect an effect on an individual's cognitive function following a post-accident administration of morphine . . . ." Verified Appl. for Post-Conviction Relief, App. 12 at 4, *Davis v. Oklahoma*, Case No. PCD-2003-686 (Okla. Crim. App. Mar. 4, 2005). Defendant asserts that "'[p]lausible to expect' is a quantitative measure meaning at least more than 50% or a reasonable probability," Aplt. Br. at 44 n.11; but he does not cite any testimony or other authority to support the assertion.

On direct appeal the OCCA upheld Defendant's waiver, stating:

Prior to any questioning, [Officer] Stieber read to Davis the *Miranda* warning from his *Miranda* card and asked Davis if he understood his rights and wanted to talk with him. Davis said that he understood his rights and that he would answer what he could. At no time during the interview did Davis indicate that he wanted to terminate the interview or consult a lawyer. Davis appeared to understand all questions asked and gave appropriate responses to the questions posed. The specificity of detail Davis was able to provide and the back and forth nature of the interview demonstrated that he was fully alert and comprehended what others said to him, thereby supplying strong evidence that he understood his rights as presented to him as well.

-11-

*Davis*, 103 P.3d at 81. Later, on appeal in the postconviction proceedings, the OCCA held that Dr. Kupiec's affidavit (and other new defense evidence) would have made no difference. It said:

> The material neither leads to a conclusion that the trial court's ruling would have been different had counsel presented the information to the court nor that the outcome of his trial would have been different had the information been presented to the jury. At best, the medical records and expert's report show there was a "potential for impairment" from the medications Davis received. The affidavits concerning Davis's clarity were refuted not only by the detectives who interviewed Davis, but by his own medical records.

*Davis*, 123 P.3d at 247 (footnote omitted).

What Defendant presents to us on appeal fails to overcome the deference owed to the OCCA decision. The expert report is hardly definitive; it merely states that there was a possibility of impairment. And even if Defendant was groggy when the officers arrived, there was ample evidence that he soon became alert. Officer Stieber testified that Defendant was "fully lucid and alert" and understood the rights read to him. R., Vol. 2, State Court Records: Tr. of *Jackson v. Denno* Proceedings at 55. Further, the interview transcript shows that he gave relevant responses to each question asked. Perhaps most indicative of his mental capacity were his responses immediately after being read his rights:

> Stieber: Okay, having these rights in mind, are you willing to visit with us a little bit and answer a few questions?
>
> [Defendant]: I'll answer what I can.
>
> Stieber: Okay. That's all we're asking for.

[Defendant]: Okay

Stieber: A (pause) one of the things that I do while I'm here is get some oral swabs from ya, I brought with me some oral swab sticks and all they are is a long Q-tip Brian.

[Defendant]: Um-huh

Stieber: (getting swabs) and what I would like to do if your willing is take, see it ain't nothin but a long Q-tip. I'd like to get four (4) of these and get oral swabs from inside your mouth and your saliva. Would that be okay with you?

[Defendant]: What is that for?

Stieber: Well, it's to do some comparison later on down the road on DNA, you know they get DNA from a lot of sources, but the easiest way for the lab is just straight from saliva, spit.

[Defendant]: I got to see what the Dr. says because I been taking all this medication and stuff.

Stieber: I asked the nurse out there just a few minutes ago and they said that you haven't taken anything this morning that would affect this at all.

[Defendant]: Okay.

Stieber: That be okay with you?

[Defendant]: uh-huh

Stieber: okay, it's painless and real simple. We'll do them one at a time and then when I put back in the envelope I'll get you to initial them a just little bit for me. If you'll just open your mouth, can you get it open any wider than that? Okay. I'll get around on the inside of your jaw, that's not too far back is it?

[Defendant]: uh-uh

Stieber: (getting samples) There's one. Halfway done. Okay, I'm going to do the other side over here on this one. One more. Okay, this one has two in it Brian, so I'll just go ahead and do another one while I'm here.

[Defendant]: You said four, tastes nasty, mmm

*Id.*, Pl.'s Ex. 2 at 1–2. Defendant was functioning well enough to ask about the medical consequences of the swab testing and to recall that the officers had initially said that there would be four samples.

We hold that the state court did not unreasonably determine the facts or unreasonably apply clearly established federal law in concluding that Defendant knowingly and intelligently waived his rights.

### 2. Alleged Coercion

Defendant next argues that his waiver of *Miranda* rights was not the product of a free and deliberate choice because the officers coerced him into confessing to the murder by calling him a "'cold-blooded killer.'" Aplt. Br. at 68. The OCCA determined that although Officer Stieber "use[d] phrases like 'cold blooded killer' and 'cold blooded bastard'" during the second interview, Defendant's statements were not coerced. *Davis*, 103 P.3d at 81. It stated:

> The comments complained of were not coercive in nature; the detectives neither threatened Davis nor implied promises of benefits or leniency. Rather, the detectives explained to Davis that the evidence showed that he was responsible for Sanford's death, leaving them to conclude that he either planned it and carried it out making him a cold blooded killer or that some unplanned fight erupted and Sanford was stabbed and killed. Only Davis could provide the answer and they encouraged him to do so.

*Id.*

As shown by the transcript of the hospital interview,[1] the OCCA decision

---

[1] The interview began with lengthy questioning of Defendant's social activities and other events before the victim arrived at his apartment. Then, Officer Stieber turned to the question of her death:

Stieber: What we found in the apartment is Jody, and she's been stabbed and she's dead.

[Defendant]: That's Mr. Bohon said the other night.

Stieber: Cause if I wanted to be mean to ya I could've brought you an ugly ass Polaroid of her body laying there bleeding.

[Defendant]: Uh-huh.

Stieber: I didn't want to do that to you, okay. (Pause) Jody's laying there in your apartment, she's laying there in the living room floor, she's been stabbed, she's very dead.

[Defendant]: Uh-huh.

Stieber: You tell us there's nobody else in that apartment, but you and her, and then you a little bit later, are in a bad car wreck, south of town, in her van. We're here to try to figure out what happened in that apartment between you and Jody Sanford

[Defendant]: Right

Stieber: for things to go to shit and end up this way.

[Defendant]: I know that.

Stieber: Okay, but it's one of two choices. Since you two are the only ones' in the apartment and she's dead it's obvious that you are the one that is responsible for her death. It's one choice or the other Brian, it's either that you are a *cold blooded killer*, which I don't

(continued...)

-15-

(...continued)
believe you are, and you planned this thing for whatever reason, or something ugly and bad happened in that apartment and you and Jody got into some type of fight for whatever reason, and the thing went to shit and the end result, was unintentional on your part, but she ended up getting stabbed and she died. Now you tell us.

[Defendant]: It's like

Stieber: No, you tell us Brian, was this, are you a *cold-blooded bastard* and this thing was planned?

[Defendant]: No, Bob I didn't think so, me and her always, she always do stuff for me.

Stieber: Okay

[Defendant]: It's like you know, whatever, you know how I get marks like this on my thumb and then marks like this across my arm. I don't know. I'm thinking is it from me going through the windshield of the van like this, or what, I don't know.

Stieber: Let's talk about that. You just made the motion with your hand up in front of you face going through the windshield, but your hand isn't cut up that way.

[Defendant]: Did I do that or, I don't know.

Stieber: Okay, let's go back to my original question. Either you're a *cold blooded bastard* and you planned on killing her for whatever reason, or things went to shit and this was the bad result of things getting ugly. Did you plan on killing her when you called her and she came over her that night?

[Defendant]: No, I didn't plan that. I, from our relationship we always had cool, everything's been cool between us.

Stieber: Okay so we can just, we can forget about that theory. Am I right?

(continued...)

did not unreasonably determine the facts or unreasonably apply clearly established federal law. Defendant cites no Supreme Court authority suggesting that it is coercive to tell a suspect truthfully that the evidence would imply that he was guilty of a heinous crime unless he gives an explanation. As the OCCA stated, the officers did not threaten Defendant or promise leniency.

We affirm the district court's decision upholding the state court's determination that Defendant's statements were admissible.

### B. Trial Counsel's Failure to Present Scientific Evidence of Impairment

---

[1](...continued)
[Defendant]: Yeah. Cause I'm not a cold blooded killer, I'm, there's a lot of people that I don't feel like Tyrone and them, the stuff that happened to me when I, you know with Shaliya and Stacy. Yeah, I'd love to get them back for that but, they; justice was served on them.

Stieber: Okay, so you're not a *cold-blooded killer* and you didn't plan on killing her so we can just forget about that.

[Defendant]: Just forget about that, yes.

Stieber: So, let's look at the other option. The other option is something happened there between you two and you guys got into it for whatever reason and you ended up, maybe it's self-defense. I don't know.

[Defendant]: What I know is that she was talking to me and that's when I had my hands up on my head.

R., Vol. 2 State Court Records: Tr. of *Jackson v. Denno* Proceedings, Pl.'s Ex. 2 at 20–21 (emphasis added).

Defendant argues that his trial counsel was ineffective in failing to present scientific evidence that would have shown his mental impairment when he gave his statements at the hospital.[2]  Although Dr. Kupiec testified as a defense expert at trial that the Versed and morphine given to Defendant are both sedatives and analgesics, Defendant complains that trial counsel failed to give Dr. Kupiec the medical records, including medication charts, that would have enabled Dr. Kupiec to speak more precisely about Defendant's condition while being interviewed.

To succeed on an ineffectiveness-of-counsel claim, Defendant must make two showings:  "that counsel's representation fell below an objective standard of reasonableness," *Strickland v. Washington*, 466 U.S. 668, 688 (1984), rendering his or her performance deficient, *see id.* at 687; and that the deficiency prejudiced the defense through errors "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable," *id.*  To demonstrate prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors," *id.* at 694, the jury "would have had a reasonable doubt respecting guilt." *Id.* at 695.  When reviewing a state court's application of *Strickland*, we must be especially attuned to the deference required by § 2254(d).  In particular, we review the state court's decision regarding prejudice only to determine whether it

---

[2] Defendant's opening brief complains of the failure of "trial *or appeal* counsel [to] provide[] [Defendant's] medical records to Dr. Kupiec."  Aplt. Br. at 42 (emphasis added).  But the brief never explains what more his state appellate counsel could have done.  Because the appellate-counsel issue has not been adequately briefed, we do not address it.

"unreasonably concluded that [Defendant] was not prejudiced." *Cullen*, 131 S. Ct. at 1408.

To try to establish prejudice, Defendant relies on an affidavit of Dr. Kupiec submitted in his postconviction proceedings. He cites Dr. Kupiec's statement that "repeated dose administration appears to result in an enhanced analgesic effect of morphine, and if administered this way, it would also have more effects on cognition and psychomotor performance." Verified Appl. for Post-Conviction Relief, App. 12 at 3 (footnote omitted), *Davis v. Oklahoma*, Case No. PCD-2003-686. He also notes the doctor's testimony that "[t]he elimination half-life of morphine ranges from 1.5 to 4.5 [hours,]" *id.*, to argue that he was impaired during the interview on November 6, when he received a morphine injection at 5 a.m., about three hours before the start of the interview. Defendant implicitly suggests that this evidence would have caused the trial judge or the jury to exclude his hospital statements as involuntary. (The jury was instructed that it should not consider a statement by Defendant unless it found that the statement was voluntary.)

The OCCA rejected the argument in Defendant's postconviction proceedings. *See Davis*, 123 P.3d at 247–48. As previously noted, the court said that, at the most, the medical records and expert's report showed a "potential for impairment" from the medications. *Id.* at 247 (internal quotation marks omitted).

-19-

It ruled that the outcome of the trial would not have been different if the evidence had been presented.

Defendant has not made the necessary showing that the OCCA "unreasonably concluded that [he] was not prejudiced" by counsel's failure to present at trial the additional evidence of impairment. *Cullen*, 131 S. Ct. at 1408. We note at the outset that even if the hospital records and expert report would have led to exclusion of his November 4 statement, the verdict would not have changed. In that statement Defendant said that he did not remember what happened. The prosecution made no attempt to exploit that statement at trial, and we fail to see how it could have prejudiced Defendant.

As for the second interview, Dr. Kupiec's new statements merely recite some general principles about how morphine functions in the body, but do not specify how Defendant would have been affected on that particular day. The OCCA could properly decide that the additional evidence would not have overcome the contrary evidence already considered in our earlier discussion of whether the *Miranda* waiver was knowing and voluntary. We cannot say that the OCCA unreasonably ruled that the new evidence would not likely have convinced the trial judge or jury to exclude Defendant's November 6 statement.

In the alternative, Defendant requests an evidentiary hearing to present additional evidence that his statements should have been excluded. But we have already considered all the evidence that he presented to the Oklahoma courts, and

under AEDPA our review of the OCCA decision on this issue must be confined to the state-court record. *See id.* at 1398 ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."); *Black v. Workman*, 682 F.3d 880, 895 (10th Cir. 2012) ("[E]ven if a federal-court evidentiary hearing is not barred by [28 U.S.C.] § 2254(e)(2), the evidence so obtained is inadmissible in reviewing a claim adjudicated on the merits in state court.").

## IV. ADDITIONAL ISSUE ON WHICH WE GRANT COA—FAILURE OF COUNSEL TO ARGUE COERCION BY WITHHOLDING MORPHINE

Defendant contends that his trial and appellate counsel were ineffective for failing to present evidence and argue that his hospital statements were coerced by the officers' refusing to allow him to receive morphine for his pain until they had completed their questioning. The parties dispute whether we have granted a COA on this claim. We think the State has the better of the argument. But Defendant's reply brief alternatively requests a COA, which we grant. Although our doing so at this stage could prejudice the State, because it has not briefed (and would not be expected to have briefed) the merits of the issue, we find no merit to the claim, eliminating any prejudice.

Before we turn to the merits of the claim, we address two more procedural issues. We hold that the claim is not procedurally barred and that our standard of

review is de novo.  To reach these conclusions, we must examine the proceedings before the OCCA.

In Defendant's appeal to the OCCA of the denial of postconviction relief, he raised the claim that his counsel had been ineffective by failing to argue that the detectives coerced him into making his statements by withholding the administration of morphine.  The OCCA denied relief without discussing the merits, stating that its decision on direct appeal had already decided the substance of this coercion argument, and therefore the principle of res judicata barred Defendant from relitigating the same claim in the guise of an ineffective-assistance-of-counsel argument.  *See Davis*, 123 P.3d at 248.  A state court's invocation of res judicata does not, however, create a procedural bar to relief under § 2254.  *See Cone v. Bell*, 129 S. Ct. 1769, 1781 (2009) ("When a state court declines to review the merits of a petitioner's claim on the ground that it has done so already, it creates no bar to federal habeas review.").  Moreover, contrary to the OCCA's belief, the record of Defendant's direct appeal to the OCCA discloses that Defendant never argued, and the OCCA never considered, a claim, either directly or in the course of an ineffective-assistance claim, that his hospital statements were coerced by the withholding of morphine.  Because there has been no state-court adjudication on the merits of the claim, AEDPA's § 2254(d) does not apply.  *See Byrd v. Workman*, 645 F.3d 1159, 1166 (10th Cir. 2011).  Further,

the district court did not address the merits. No prior court having addressed the merits, our review is necessarily de novo.

Now, to the merits. To assess Defendant's ineffective-assistance-of-counsel claim, we first examine the strength of the claim omitted by his counsel—the claim that he was coerced by the withholding of morphine. Defendant bases that claim on the following evidence and argument. First, he cites two pieces of evidence that he was told on November 4 that he would not receive any morphine until his interview was over. One is a hospital nurse's note at 5:30 p.m. on November 4 saying that he was told by a nurse that an "officer wanted to talk [with him] prior to any pain meds being administered[.]" Verified Appl. for Post-Conviction Relief, App. 6 at 2, *Davis v. Oklahoma*, Case No. PCD-2003-686. The other is the following exchange with Detective Bohon during the 25-minute interview (which began about 20 minutes after the nurse's note):

> [Defendant]: I'm telling the truth. That's all I can remember I wish I could, but I can't. All I remember is being by those trees and then those people surrounding me picking me up and putting me in the ambulance. I hardly remember talking to the Highway Patrol when they came because they had me on morphine.
>
> Bohon: put you on some medication yeah
>
> [Defendant]: Yeah
>
> Bohon: Yeah, that's why I waited for awhile because *I wanted to make sure the medicine had worn off* because I wanted you to be able to remember the best you can and understand what I was saying.
>
> [Defendant]: I understand what you're saying.

-23-

Bohon: *As soon as we get done here they will help you out with somemore*, but I had to have you as clear headed as I could for this.

R., Vol. 2, State Court Records: Tr. of *Jackson v. Denno* Proceedings, Pl.'s Ex. 1 at 10 (emphasis added). Defendant contends that from the statements by the nurse and Bohon, he "was trained . . . that the only way he could end the interview was to be submissive, answer the questions and he got morphine." Aplt. Br. at 61.

Second, although Defendant never testified expressly that he spoke to the officers only to get morphine for his pain (indeed, when asked at trial whether Detective Stieber threatened him in any way, he answered, "Just the comment . . . . Either you're a cold-blooded killer or a mean mother fucker." R., Vol. 2 State Court Records: Tr. of Jury Trial, Vol. 7-A at 16), he argues that he implied this on the following two occasions during his cross-examination:

> Q. Are you telling this jury, in any way, that your statement to Detective Stieber [on November 6] was not voluntary?
>
> A. At one point it wasn't, at the beginning, but *I have to be submissive in the hospital cause of being treated* and things like that.

*Id.* at 15–16 (emphasis added).

> Q. Mr. Davis, when Bob Stieber came to see you on the 6th and probably when Bohon came on the 4th, were you scared about what was going to happen to you?
>
> A. No, I wasn't scared. I was just tired and I was hurting, I wanted to be left alone, but *had to be submissive to get treatment.*

*Id.*, Vol. 7-B at 52 (emphasis added).

Defendant also points to the occasions during his November 6 interview when Bohon and Stieber continued to question him despite his complaints that he was in pain. His first indication of pain was about an hour and a half into the interview:

> Stieber: The knife that was laying there by that towel, that's the one that both of you ended up getting cut with? It's the same one?
>
> [Defendant]: Yeah.
>
> Stieber: Okay,
>
> [Defendant]: ????? [sic] It was a big long knife. (Sighs) Can I get some shot now, cause I'm in pain?
>
> Stieber: Yeah, we're just about done.
>
> [Defendant]: (sighs) ???? [sic] something for pain.
>
> Steiber: Yeah, I'm trying to think of any other details.

*Id.*, Tr. of *Jackson v. Denno* Proceedings, Pl.'s Ex. 2 at 58. A nurse entered the room about two minutes later and remained for two minutes, during which the nurse administered antinausea and blood-thinner medication and discussed with the officers the procedures for taking a photograph of Defendant's arm wounds. The nurse returned about nine minutes later with a consent form for taking the photograph. On neither of these occasions did Defendant ask the nurse for pain medication. Then, about two minutes after the nurse's return, an orthopedic surgeon came to check on Defendant:

[Doctor]:  Now, they'll be coming to get you a pretty soon, for [hip surgery].  How ya doin?  Is there a lot of pain or are you doing okay?

[Defendant]:  My back is hurtin.

[Doctor]:  Your back is hurting.  But your legs not so much.

[Defendant]:  Well, if I move it yeah.

[Doctor]:  Yeah, but when your laying still it's okay?

[Defendant]:  but my back's botherin me.

[Doctor]:  Low back?

[Defendant]:  yeah.

[Doctor]:  There are no fractures there, it's probably from just laying in bed and not being able to move very much.

[Defendant]:  yeah

[Doctor]:  Unfortunately

[Defendant]:  Okay

. . .

[Doctor]:  Okay, well I'll let them finish that's all I needed to check on right now.

[Defendant]:  Well, can I, am I going to be able to some medication after this or

[Doctor]:  Pain medication

[Defendant]:  Okay

Stieber:  We are just about through,

[Doctor]:  It's fine with me, whatever you need to do.

-26-

*Id.* at 69–70. Finally, Defendant notes his trial testimony that when the officers read him his *Miranda* rights at the start of the November 6 interview, he was, "Tired, in pain, wanting to sleep." *Id.*, Tr. of Jury Trial, Vol. 7-B at 61.

Defendant's claim that he was coerced by the withholding of morphine is flawed on many levels. First, the evidence that Defendant felt coerced by the withholding of morphine is very weak, if not nonexistent. The only statements that he points to regarding his state of mind are two ambiguous comments during his cross-examination. Asked whether he was testifying that his statement to Stieber on November 6 was not voluntary, he responded: "At one point it wasn't, at the beginning, but *I have to be submissive in the hospital cause of being treated and things like that.*" *Id.*, Vol. 7-A at 15–16 (emphasis added). And asked if he was afraid about what was going to happen to him when the officers came to interview him, he answered: "No, I wasn't scared. I was just tired and I was hurting, I wanted to be left alone, but *had to be submissive to get treatment.*" *Id.*, Vol. 7-B at 52 (emphasis added). Nothing in the record expands upon those statements, which make no reference to morphine.

Second, Defendant's claim is conceptually confusing, almost incoherent. Ordinarily, when one thinks of a coerced confession, one thinks of law-enforcement officers telling the suspect that he must confess, or else. That, however, is not Defendant's claim, and nothing in the record even hints at such a communication from the officers to Defendant. Defendant points to the

-27-

November 4 statements by the nurse and Bohan that he would not receive any morphine until the interview was over. But the evidence regarding that interview shows the opposite of such alleged coercion: the sooner he quit talking, the sooner he would get morphine. Bohan left after 25 minutes, shortly after Defendant said, "I'm hurting and I'm tired," *id.*, Tr. of *Jackson v. Denno* Proceedings, Pl.'s Ex. 1 at 11, even though Defendant had been saying that he could remember nothing about the victim's death. What Defendant would learn from this encounter is that he could get his morphine quickly if he feigned a lack of memory, so the officer would give up and leave. (We say "feigned" advisedly, because Defendant testified at trial that he actually remembered everything when he was interviewed on November 4. *See id.*, Tr. of Jury Trial, Vol. 7-A at 12–14.). And nothing changed the rules for the November 6 interview. No one told Defendant that the officers would not leave until he confessed. To the contrary, the only time that Defendant indicated that he did not want to talk—saying, " I, I don't have to tell ya nothin, I don't have to," *id.*, Tr. of *Jackson v. Denno* Proceedings, Pl.'s Ex. 2 at 74—Stieber agreed, stating, "I know you don't have to," *id.* Perhaps Defendant could (but does not) claim that he was coerced *into silence* on November 4 because the only way to get morphine was to quit talking; but that must be an unprecedented claim of coercion, and even if his feigning memory loss was coerced, Defendant was not prejudiced because, as

noted earlier, the prosecutor did not attempt at trial to exploit Defendant's alleged lack of memory on November 4.

Third, there is no evidence in the record that Defendant was suffering significant pain during the critical part of the November 6 interview. His first mention of pain was about 90 minutes into the interview. What he said after that point would not have affected the outcome of the trial; he had already described his struggles with the victim. Given Defendant's willingness to mention his pain at that point, it would be surprising if he had kept silent while suffering earlier in the interview, particularly when, as Stieber testified, medical personnel entered the room during the interview to check on Defendant four or five times.

For Defendant to prevail on his claim of ineffective assistance of counsel, he must establish that any competent attorney would have raised the morphine-coercion claim and that he was prejudiced by the failure of his attorneys to do so. *See Strickland*, 466 U.S. at 687–88. But the coercion claim was so far-fetched that Defendant fails on both counts. His attorneys were not acting unreasonably in failing to pursue the claim, and there is no reasonable chance that his hospital statements would have been suppressed (and a different verdict rendered) if they had done so.

In his opening brief in this court, Defendant suggests that he should be granted an evidentiary hearing on this coercion claim. He argues in a footnote:

> If Petitioner was granted a state evidentiary hearing he could have cross-examined the officers using the records that were not submitted until post-conviction. He could have asked Dr. Kupiec or one of the doctors from the hospital to compare audio tapes of Brian Davis' voice patterns from the trial when he was in pain and under the influence of morphine to the tapes of his interviews in the hospital to determine his level of impairment and distress. He could have called the nurses and doctors as witnesses to reveal their conversations with the officers as they constructed their plan to suspend Petitioner Pain medication.

Aplt. Br. at 34 n.8. Because the OCCA did not address this coercion issue on the merits and § 2254(d) therefore is inapplicable, evidence from a federal-court evidentiary hearing could be considered in resolving the issue. It does not necessarily follow, however, that Defendant is entitled to an evidentiary hearing. We have said that "[d]istrict courts are not required to hold evidentiary hearings in collateral attacks without a firm idea of what the testimony will encompass and how it will support a movant's claim." *United States v. Cervini*, 379 F.3d 987, 994 (10th Cir. 2004). Defendant's presentation to this court may not satisfy this standard. We need not resolve the matter, however, because Defendant forfeited the issue by not seeking an evidentiary hearing on the morphine-withholding coercion claim in district court. Although he moved for an evidentiary hearing below, his motion contains no reference to this claim; it relates only to the contention that he was too impaired to waive his *Miranda* rights. Defendant presents no "reason to deviate from the general rule that we do not address

-30-

arguments presented for the first time on appeal." *United States v. Moya*, 676 F.3d 1211, 1213 (10th Cir. 2012) (internal quotation marks omitted).

## V.    REQUEST FOR COA ON ADDITIONAL ISSUES

A COA will issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard requires "a demonstration that . . . includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the [application] should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks omitted). In other words, the applicant must show that the district court's resolution of the constitutional claim was either "debatable or wrong." *Id.* And for those of Applicant's claims that the OCCA adjudicated on the merits, "AEDPA's deferential treatment of state court decisions must be incorporated into our consideration of [his] request for [a] COA." *Dockins v. Hines*, 374 F.3d 935, 938 (10th Cir. 2004).

We now turn to Defendant's request for a COA on claims 4 to 9.

### A.    Claims 4 & 5:  Rebuttal Witness Testimony

Defendant requests a COA on two related claims challenging the admission of the rebuttal testimony of Russell Busby, who was not disclosed on the state's pretrial list of witnesses. Busby, the chief investigator for the District Attorney, testified as an expert to rebut Defendant's trial version of events. Based on his

review of photographs and reports of the crime scene, as well as consultations with the medical examiner's office, he expressed his opinion (1) that the absence of blood stains on the bedroom carpet showed that all the knife wounds to the victim could not have been inflicted, as Defendant testified, while she was standing in the bedroom by the bathroom door, and (2) that the two parallel wounds on his arm did not appear to be defensive wounds. Defendant contends (1) that the lack of pretrial notice of the intention to call Mr. Busby deprived him of a due-process right created by Oklahoma law requiring prior notice of the expert witness, as well as of the fundamental fairness that is the essence of due process, *see Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974); and (2) that permitting the State not to disclose such a witness violated due-process principles articulated in *Wardius v. Oregon*, 412 U.S. 470, 475 (1973) ("[I]n the absence of a strong showing of state interests to the contrary, discovery must be a two-way street. The State may not insist that trials be run as a 'search for truth' so far as defense witnesses are concerned, while maintaining 'poker game' secrecy for its own witnesses.").

The OCCA held that Busby's testimony was admissible, stating that it "was relevant to refute Defendant's claims made for the first time during his trial testimony concerning the manner and locations of the knife attack that were different than his pre-trial statements." *Davi*s, 103 P.3d at 77. The district court

agreed, reasoning that the state was previously unaware of the version presented at trial.

We agree that AEDPA requires affirmance. First, the Oklahoma notice requirement did not create a federal due-process right. *See Elliott v. Martinez*, 675 F.3d 1241, 1244–45 (10th Cir. 2012) (a state-created procedural right is not a liberty interest protected under the Constitution's Due Process Clause). Therefore, even if the state rule was violated, Defendant cannot obtain relief on that ground under § 2254, which limits review to claims based on federal law. *See Turrentine v. Mullin*, 390 F.3d 1181, 1195–96 (10th Cir. 2004) ("[A] federal court under § 2254 may not grant relief unless there was an error of federal law, in other words, unless this error amounted to a violation of the federal constitution.").

Second, there is nothing so unfair as to violate due process in permitting the government to put on a rebuttal witness to challenge defense testimony that could not be anticipated before trial. And Defendant has cited no Supreme Court decision suggesting that such a rebuttal witness must be disclosed before trial. *Wardius*, which dealt with a notice-of-alibi rule, did not address rebuttal testimony. Defendant argues that the OCCA unreasonably determined the facts in saying that his testimony could not have been reasonably anticipated and that Busby was therefore a proper rebuttal witness. He relies on Stacey Sanford's trial testimony that in the second of three versions of events conveyed to her by

Defendant (and presumably reported to the state before trial), he said that one of the stabbings occurred in the bedroom. But this evidence is hardly clear and convincing evidence that the OCCA got it wrong. *See* 28 U.S.C. § 2254(e)(1) (determination of factual issue by state court is presumed correct and presumption can be overcome only by clear and convincing evidence). The second version recited by Stacey was too vague to be contradicted by the physical evidence testified to by Busby. Busby's testimony was useful only because of the specificity of Defendant's trial version of the stabbings.

Moreover, Defendant has not cited to any Supreme Court decision clearly establishing that due process requires the state to disclose expert testimony before trial when the defendant has not been required to disclose its witnesses *on the same subject*. The holding in *Wardius* is only that the government cannot require the defendant to disclose an alibi defense witness unless the government will also disclose its witnesses rebutting that defense. Defendant was not required to provide any pretrial discovery regarding the locations of the stabbings. No reasonable jurist could debate the district court's conclusion that Defendant is not entitled to relief on this claim.

**B.      Claim 6: Sufficiency of the Evidence of First Degree Murder**

Defendant argues that there was insufficient evidence to support a finding of guilt if his statements to the police or Busby's rebuttal testimony is held to be inadmissible. But (1) we have rejected his challenges to the admission of the

evidence; and (2) when considering a challenge to the sufficiency of the evidence, we consider all evidence admitted at trial, even if admitted improperly, *see Lockhart v. Nelson*, 488 U.S. 33, 40–41 (1988) (a reviewing court should consider erroneously admitted evidence in determining whether double jeopardy bars retrial due to insufficient evidence). No reasonable jurist could debate the district court's rejection of this claim.

## C.    Claim 7:  Jury Instruction on Circumstantial Evidence

Defendant argues that because the evidence of malice aforethought was entirely circumstantial, he had a due-process right to the following requested jury instruction:

> The State relies in part for a conviction upon circumstantial evidence. In order to warrant conviction of a crime upon circumstantial evidence, each fact necessary to prove the guilt of the defendant must be established by the evidence beyond a reasonable doubt. All the facts necessary to such proof must be consistent with each other and with the conclusion of guilt the State seeks to establish. All of the facts and circumstances, taken together, must be inconsistent with any reasonable theory or conclusion of a defendant's innocence. All of the facts and circumstances, taken together, must establish to your satisfaction the guilt of the defendant beyond a reasonable doubt.

OUJI-CR 9-5, Vernon's Okla. Forms 2d 456 (2003 ed.) (brackets omitted). *See Riley v. State*, 760 P.2d 198, 199 (Okla. Crim. App. 1988) ("[C]onvictions based entirely upon circumstantial evidence cannot be sustained unless the evidence presented excludes every reasonable hypothesis except that of guilt."). The OCCA rejected the argument on the ground that there was both direct and

-35-

circumstantial evidence of guilt. *See Davis*, 103 P.3d at 79. The district court agreed and found no error.

In any event, even if state law required the instruction, a violation of a state rule is not in itself a ground for relief under § 2254. *See Turrentine*, 390 F.3d at 1195–96. And Defendant has not directed our attention to any decision of the United States Supreme Court requiring a circumstantial-evidence instruction as a matter of constitutional law. No reasonable jurist could debate the district court's rejection of this claim.

### D.    Claim 8:  Evidence of Affair of Victim's Husband

Defendant argues that his rights to confrontation and compulsory process were violated when the trial court did not allow him to question witnesses about an alleged affair of the victim's husband. He maintains that evidence of the affair would have supported his testimony that the victim was crying over her husband's affair, Defendant tried to comfort her, they engaged in consensual sex, and she (already feeling rejected by her husband) attacked him when he criticized her sexual performance. The OCCA rejected the argument, writing:

> Before calling Tom Sanford[, the victim's husband,] to testify, the State moved *in limine* to prohibit the defense from questioning him about whether or not he had engaged in an extra-marital affair. The State argued that Tom Sanford's participation in any extra-marital affair was not relevant to the case. The defense argued it had the right to address the subject since the State had presented evidence of it through Stacey Sanford[6] and such evidence was relevant to Jody Sanford's state of mind to show whether she would have given consent to have sex with Davis. The State responded that

it had not offered evidence that an affair had actually taken place, only that Davis had told Stacey that her mother was upset about an affair. The trial court ruled that evidence of an actual affair was not relevant, but even if it were, the prejudicial effect outweighed any probative value it might have had.

It is well established that the scope of cross-examination and the admission of evidence lie in the sound discretion of the trial court, whose rulings will not be disturbed unless that discretion is clearly abused, resulting in manifest prejudice to the accused. There is no such abuse of discretion in the present case. Whether Jody Sanford had heard a rumor of an affair and whether she believed it as true would not have been rendered more or less probable by the admission of evidence indicating whether or not Tom Sanford had actually engaged in an extra-marital affair. The issue was Jody Sanford's existing state-of-mind to which Davis testified. Davis repeated his claim under oath that Sanford was upset about her husband's alleged affair in support of his claim that they had consensual sex. Therefore, evidence from Sanford that he actually engaged in an affair was not relevant to the issues in controversy.

The same is true for Raymond Pollard[, a friend of Defendant,] and Stacey Sanford. The defense sought to question Pollard in its case-in-chief about seeing Tom Sanford in the company of a woman, not his wife. Such evidence was irrelevant to the issue of consent or Sanford's state of mind at the time of her death. Likewise, the defense wanted to ask Stacey if she had heard the rumors Davis had heard about her father being involved in an extra-marital affair and whether she knew if her mother had heard or knew of the rumors. Defense counsel did not indicate that he had any knowledge to support an offer of proof that Stacey knew her mother was aware of any alleged affair and was affected by it in the days before her death. Based on this record, it cannot be said the trial court abused its discretion in limiting defense counsel's questioning of these witnesses. Accordingly, we find this claim has no merit.

*Davis*, 103 P.3d at 79–80 (citations and footnote omitted). Footnote 6 states:

Stacey had earlier testified about Davis' third statement to her in which he admitted, after being confronted with DNA evidence, to having sex with her mother before he killed her. Davis told Stacey that her mother was upset about her husband cheating on her and that Davis' attempts to comfort her led to consensual sexual intercourse.

-37-

*Id*. at 79 n.6.

The district court analyzed Defendant's constitutional claims as follows:

The Confrontation Clause of the Sixth Amendment "guarantees the right of an accused in a criminal prosecution to be confronted with the witnesses against him." *Davis v. Alaska*, 415 U.S. 308, 315 (1974) (internal quotation omitted). "[A] primary interest secured by [the Confrontation Clause] is the right of cross-examination." *Id.* (citation omitted). "[A] defendant's right to confrontation may be violated if the trial court precludes an entire relevant area of cross-examination." *Richmond v. Embry*, 122 F.3d 866, 871 (10th Cir. 1997) (internal quotation omitted). However, the right to cross-examination is not unlimited. "[T]rial judges retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). There is no recognized constitutional right for criminal defendants to "present evidence that is not relevant and not material to his defense." *United States v. Solomon*, 399 F.3d 1231, 1239 (10th Cir. 2005).

Petitioner's claim also involves the Compulsory Process Clause of the Sixth Amendment. (Pet. at 80-84.) "A defendant's right to due process and compulsory process includes the right to present witnesses in his or her own defense." *Richmond*, 122 F.3d at 871 (citing *Washington v. Texas*, 388 U.S. 14, 18-19 (1967)). "[T]he state may not arbitrarily deny a defendant the ability to present testimony that is 'relevant and material and . . . vital to the defense.'" *Id.* at 872 (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982)). A party seeking to establish a violation of the right to compulsory process must establish that the exclusion of the proffered testimony resulted in fundamental unfairness. *Id.* As the Tenth Circuit explained:

In order to establish a violation of his due process right to present evidence, a defendant must show that the evidence excluded by the trial court's ruling might have affected the trial's outcome; in other words, he must show that the evidence, if admitted, would have created reasonable doubt that did not exist without the evidence.

*Patton v. Mullin*, 425 F.3d 788, 797 (10th Cir. 2005) (citing *Valenzuela-Bernal*, 458 U.S. at 868).

The Court finds the OCCA's determination is a reasonable application of clearly established federal law. The evidence in question was, at best, marginally relevant to Petitioner's case. That Tom Sanford had an affair, or whether other witnesses were aware of rumors of an alleged affair, may tend to support Petitioner's version of events, in the sense that Jody may have been distraught over allegations of her husband's infidelity. However, the connection is tenuous. The proffered testimony would not indicate whether Jody had actual knowledge of a possible affair or rumors of an affair. In other words, it was not relevant to Jody's state of mind on the night in question. The OCCA's determination that the trial court was within its discretion is not unreasonable.

Moreover, the evidence fails to meet the "materiality" standard required for a constitutional violation. *Richmond*, 122 F.3d at 872; *see also Patton*, 425 F.3d at 798 (holding that petitioner failed to establish the materiality of excluded evidence). In the context of all the evidence presented at trial, including Petitioner's own admissions to the stabbing, Busby's testimony refuting Petitioner's last version of events, and the physical evidence of Jody's homicide, the exclusion of allegations of an alleged affair of Tom Sanford did not render Petitioner's trial fundamentally unfair. Testimony suggesting Mr. Sanford had an affair would not have created reasonable doubt where none existed before. *Richmond*, 122 F.3d at 872. As the evidence was marginally relevant and not material to Petitioner's defense, the Court finds the OCCA's determination is not contrary to, nor an unreasonable application of, clearly established federal law.

R., Vol. 1 pt. 3 at 432–34.

In our view, no reasonable jurist could debate the district court's conclusion that Defendant was not entitled to relief on this claim.

### E.     Claim 9:  Cumulative Error

Finally, Defendant contends that the cumulative impact of errors rendered the state-court proceedings fundamentally unfair. *See Workman v. Mullin*, 342

F.3d 1100, 1116 (10th Cir. 2003) ("Cumulative error is present when the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." (internal quotation marks omitted)). The OCCA ruled that cumulative error did not render Defendant's trial unfair. *See Davis*, 123 P.3d at 248. Discerning no error, the district court agreed. No reasonable jurist could debate the district court's conclusion that the OCCA did not unreasonably apply federal law or unreasonably find facts in rejecting this claim.

## VI.    CONCLUSION

We AFFIRM the district court's denial of claims 1, 2, and 3. For all other claims for which Defendant has sought a COA from this court, we DENY the request.